Matter of Charisma D. (2005 NY Slip Op 50802(U))

[*1]

Matter of Charisma D.

2005 NY Slip Op 50802(U)

Decided on May 31, 2005

Family Court, Kings County

Freeman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 31, 2005

Family Court, Kings County
In the Matter of Charisma D.
B-7754/02

For Administration for Children's ServicesNoah Powlen, Esq.
For Seamen's Society for ChildrenJohn Eyerman, Esq.
Law GuardianJill Wade, Esq.
For Marlene P. James M. Abramson, Esq.

Nora Freeman, J.
By order dated October 25, 2004 this Court permitted Marlene P, formerly the foster parent of the child Charisma D., to participate in a permanency proceeding pursuant to a petition filed by the Administration for Children's Services ("ACS"); Family Court Act ("FCA") section 1055-a. The Court stated in that order that "given the significant events . . . the Court's review will require a full hearing to determine
"the ultimate question of what arrangement is best for the child in light of current circumstances.'" ACS moved on December 21, 2004 to re-argue and to vacate the October 25th order. After reviewing the papers submitted since December 21, 2004 by ACS, Seamen's Society for Children ("the agency"), the law guardian, and Ms P., the Court grants the motion for re-argument and upon re-argument denies Ms. P. status to participate, and vacates the October 25, [*2]2004 order. The Court's reasons are set forth below.
Procedural History
Charisma was placed in foster care shortly after her birth on July 8, 1999. The neglect case against her birth mother (docket NN16047/99) was completed promptly, resulting in a dispositional order dated November 4, 1999, which placed Charisma in foster care until September, 2000. The agency's petition to terminate parental rights, filed on April 9, 2002, was granted after inquest on August 7, 2002. The birth mother, however, filed a motion to vacate the order entered on her default. That motion was granted on February 27, 2003. After a second inquest held on May 20, 2002 the Court again signed an order terminating parental rights (on June 20, 2003). A second motion to vacate the default was "settled" on September 4, 2003, by agreement to uphold the fact-finding of permanent neglect but to hold a new dispositional hearing.
The third dispositional hearing the only one in which Charisma's birth mother participated was held on December 2 and 4, 2003. Both the birth mother and Charisma's foster mother Marlene P. (with whom Charisma was placed in February, 2002) testified at the December 2003 hearing. The Court found that it was in Charisma's best interest to grant the petition, allowing Charisma to be adopted by Ms. P., despite evidence that Ms P. had, contrary to clear foster care regulations, used corporal punishment to discipline Charisma. The Court noted at the conclusion of the hearing that the discipline did not reach to the level of "excessive corporal punishment" that would warrant a neglect petition; that Ms. P. had cooperated fully in agency-sponsored programs teaching parenting skills and anger management; and that except for the isolated incident of corporal punishment, Ms. P. had provided exemplary care for
Charisma, who was described by the agency caseworkers as closely bonded with Ms. P. and thriving in her home.
Following entry of the order transferring Charisma's custody and guardianship jointly to ACS and the agency, a permanency petition was filed pursuant to FCA section 1055-a, and on March 18, 2004 Referee Gayle Lerner continued foster care for six months, to allow time to file and complete the adoption.
A second 1055-a petition, filed on June 20, 2004, initiated the present litigation.
That petition recited that Charisma's permanency plan was adoption by Marlene P., to
whom notice of the petition was sent. However, on July 8, 2004 (the return date of the petition) it was disclosed that Charisma had been removed from the P. foster home on
April 18, after the agency and ACS investigated a report from Charisma's pre-school that the child had been hit in the face by Ms. P., causing scratches, swelling and bruising.
ACS claimed the notice to Ms P. was a mere clerical error; she, however, retained counsel and on July 14, 2004 filed a cross-petition for a permanency hearing at which she would be allowed to participate.
[*3]
When the permanency petition and cross-petition were referred to this Court, on July 15, 2004, the Court learned for the first time of Charisma's removal from Marlene P.'s care and of the de-certification of her foster home. The Court was informed that Ms. P. had requested the "independent review" of those decisions to which she was entitled; that the independent reviewer upheld the decisions; and that five-year-old Charisma was deeply distressed by her abrupt removal from the home in which she had lived since she was two and a half years old. Ms. P.'s cross-petition requested not only a role in the permanency proceeding, but court-ordered visitation with Charisma and immediate therapy for the child.
 With hearing dates some weeks away, and given the child's long-term bond with Ms. P., the severity of her behavioral problems in her new foster home, and the
uncertainty of the outcome of Ms. P.'s administrative appeals, the Court sought recommendations from mental health professionals regarding visitation with Ms. P. during the pendency of the litigation. Despite repeated court orders, Charisma's engagement in therapy and receipt of the requested recommendations were delayed for months. Finally, the Court received reports dated November 9, 16 and 18 from Dr. Erba, offering the opinion that visitation could not even be considered until the ultimate question of Charisma's future home was decided. Since the purpose of the evaluation was to assess visitation in the context of a prolonged period of uncertainty, Dr. Erba's reports begged the question. However, given the opposition to visits by ACS, the agency, and Charisma's law guardian, the Court denied Ms. P.'s motion for further visits. (Two "visits" had been held as part of the evaluation, and were observed by Dr.
Mangiotti and the law guardian's Social worker.)
On October 25, 2004 the Court denied ACS's motion to dismiss Ms. P.'s petition and stated its intention to conduct "a full hearing" regarding what plan would serve Charisma's best interests. Throughout the fall of 2004 the Court was informed that the "fair hearing"held before the Office of Children and Family Services ("OCFS") was still "pending," and ACS and the agency reiterated their firm refusal to consent to adoption by Ms. P. even if they were ordered to return Charisma to her home. On December 21, ACS filed its motion to re-argue, and in January 2005 the Court requested memoranda of law addressing Family Court's authority to approve adoption by a former foster parent without the agency's consent. Memoranda and affirmations were submitted by all parties, and on February 4, 2005 the Court reserved decision on the motion to re-argue. (As directed by the Court, the agency provided copies of OCFS's March 22, 2005 decision at the fair hearing, to the Court and all counsel. OCFS upheld the removal of Charisma from the P. foster home.)
 Legal Analysis
The Court acknowledges error in its reliance on a sub-section of FCA §1055-a that has since been amended. FCA §1055-a(4) no longer includes among those persons who "shall" be served with permanency petitions and who "shall be entitled to participate" a Foster parent in whose home the child "has resided." However, sub-section 2(c) of section 1055-a still permits the filing of such a petition "by the foster parent in whose home the child resides or has resided [*4]during such period of twelve months" [emphasis added] and sub-section 4(f) requires notice and participatory status to "such other person as the court may, in its discretion, direct." Thus it appears this Court may entertain a petition filed by a former foster parent and exercise discretion to grant a former foster parent notice and the right to participate. However, upon review of the unique circumstances of this case, the Court will not exercise discretion to allow Ms. P. to participate at this stage of the proceedings.
The critical facts are undisputed. Ms. P. was Charisma's foster parent from February, 2002 until April, 2004. She was the prospective adoptive parent called by the agency to testify at the dispositional hearing held in December 2003. She acknowledged
at the hearing, under oath, that she was aware of the regulation prohibiting a foster parent from using corporal punishment to discipline a child, (18 NYCRR 441.9( c)), that she had nonetheless hit Charisma in the past, that she had benefitted from the agency's parenting and anger management training, that she loved Charisma and was committed to adopting her, and that she would not use corporal punishment again. In affidavits submitted in the course of the current litigation Ms. P. admits that in April 2004 she again struck four-year-old Charisma. (The precise details of Ms. P.'s admissions vary somewhat, depending on the source: her own affidavits, accounts by the pre-school staff, agency caseworkers, friends in whom she confided, and her testimony at the administrative hearings.) Since her removal from the P. foster home, Charisma has been placed in a new foster home. Her early adjustment was difficult, but has improved and the agency considers the home to be pre-adoptive. Ms. P.'s administrative challenges to the agency's removal of Charisma and closing of her foster home have been twice denied, first at the independent review (June 1, 2004) and on March 22, 2005 at the fair hearing. These facts must be assessed in the context of several statutes (Domestic Relations Law, Social Services Law, Family Court Act and CPLR), the regulations governing foster care agencies (18 NYCRR Parts 421, 430, 431) and appellate case law.
The licensing and regulation of foster homes is an executive responsibility carried out by local departments of social services (including ACS) under the statewide authority of OCFS. See SSL sections 375 and 376 and 18 NYCRR 443, 477 and 476. ACS has contracts with numerous private "authorized agencies" (such as Seamen's Society for Children) to provide foster care and adoption services. The Family Court may not require an authorized agency to license or certify a foster home (Matter of Hasani B, 195 AD2d 404 (1st Dept. 1993) and is not the proper forum in which to challenge removal of a child or de-certification of a foster home. Such a challenge may be sought only through the administrative procedures for an independent review and fair hearing (18 NYCRR 421.15[g], 443.5,) and ultimately through judicial review pursuant to CPLR Article 78. Ninesling v. Nassau County DSS, 46 NY2d 382 (1978), reargue denied 46 NY2d 836 (1978).
Adoption of a foster child requires the consent of the agency to which the child's custody and guardianship have been committed; DRL sections 111(1)(f), 113. And just as an Article 78 proceeding is the sole method of challenging removal of a child from a foster home, "it is also the appropriate vehicle for review of an agency determination denying consent to adoption by [*5]foster parents." O'Rourke v. Kirby, 54 NY2d 8 (1981).
Exhaustion of administrative remedies and decision of a proceeding under Article 78 will without a doubt take time, and a central focus of recent federal and state law (the
Adoption and Safe Families Act, or "ASFA") is the need to assure prompt decisions regarding a child's "permanency." However, appellate courts have not approved efforts by Family Courts to "expedite" proceedings at the expense of infringing on executive powers. In Matter of Mary, 227 AD2d 44 (4th Dept. 1996) as amended on reargument (1991) the Family Court had ordered a "best interests hearing" when foster parents from whom a child had been ordered removed filed an adoption petition without the consent of the agency. The appellate court declared "the critical issue" to be "whether an agency may determine in the first instance whether prospective adoptive parents should be permitted to apply for adoption of a child entrusted to its care and custody," and concluded that the agency may do so, subject only to administrative review and an Article 78 proceeding. The court wrote that when
Family Court, in an effort to expedite this matter, chose to
exercise its authority over the adoption under NY Constitution
Article VI, section 13(b) and Domestic Relations Law 112-a
by immediately determining whether adoption by petitioners is
in the best interests of the child . . . it precluded [the agency] from
exercising its professional judgment . . . . Id., at 46.
The appellate court added that "While it may be tempting to follow the expedited route fashioned by Family Court, to do so would disrupt procedures that have been in place for years and would ignore the expertise of [the agency]." Id.
Finally, the Fourth Department rejected the "Family Court's concerns" that requiring administrative review would "deprive Family Court of its ultimate 'best interests' jurisdiction and divert the determination to the authorized agency." The court noted that the agency's determinations to remove a child from a home it had previously deemed "pre-adoptive" and to withhold its consent to the adoption are subject to Supreme Court review "and any agency decision that was not in the best interests of the child would necessarily be arbitrary and capricious or unsupported by substantial evidence."[emphasis added] Family Court's role was limited to conducting a best interests analysis when a proper petition one with the agency's consent was presented for its approval. See also Matter of Ralph, 274 AD2d 965 (4th Dept. 2000)
The same appellate court applied its own analysis when, in 2001, it determined an
Article 78 proceeding filed by foster parents from whom a child had been removed. In Matter of John B, 289 AD2d 1090 (4th Dept. 2001), the Fourth Department reviewed for the second time the tortuous history of two half-siblings who had been the subjects of an appeal in 2000 (Matter of Ralph, Id.) The court summarized the facts as follows: half-siblings Georgina and Ralph had been placed in the foster home of the B's, who hoped to adopt both children. Upon medical [*6]advice, however, the agency determined that Ralph's special needs could be better met in a separate home, a decision the B's did not challenge. Ralph's new foster parents, however, subsequently sought and obtained the agency's approval to adopt both children. Both the B's and Ralph's new foster parents then filed adoption petitions for the two children. The adoption agency ordered that Georgina be removed from the B's home, but Family Court, where both sets of "competing adoptive parents" had filed their petitions, stayed the removal order. Instead of pursuing administrative review, the agency and the competing adoptive parents consented to Family Court holding a hearing to determine which of the two adoptive homes would best serve the needs of the two children.
The Appellate Division rejected that course of action, holding at 274 AD2d 966 that the agency had "improperly abdicated its responsibility to exercise its professional judgment in placing for adoption these two children who were in its lawful care and custody." See DRL 111(1)(f), 112(2)." The appellate court dismissed the adoption petitions, subject to the parties' rights to file new petitions with the agency's consent or to challenge denial of consent through an Article 78 proceeding.
Following the appellate ruling in 2000, the B's filed administrative appeals of the agency's removal of Georgina. The removal was upheld by the Administrative Law Judge, and the B's filed an Article 78 petition. In its determination of that proceeding, at 289 AD2d 1090 the court emphasized that it was not conducting a de novo review of the best interests of the child, but was applying "the usual CPLR article 78 standards." The Court noted, however, that the best interests of the child "are of great importance during the review process . . . because it is the agency's duty to act in the best interests of the child." 289 AD2d at 1092.
After a thorough review of the record, the Fourth Department concluded that the agency's decision to remove Georgina from the B's foster home in order to have her adopted with her half-sibling Ralph was arbitrary and capricious and not supported by substantial evidence. Accordingly, the removal order was annulled and the matter was remitted to the agency (which presumably would consent to Georgina's adoption by the only "parents" she had ever known).
In its decision, the Fourth Department acknowledged that each of what it called "the competing adoptive parents" were "a loving, well-intentioned party who would be a fit adoptive parent," and that adoptions should be expedited. Its decision to annul the agency's removal of Georgina was issued in December 2001, more than two years after the agency served its ten-day removal notice in April 1999. The process of agency regulation of foster homes and the necessity of the agency consenting to the proposed adoption, subject only to administrative review and judicial review through an Article 78 Proceeding have been recognized as central to the administration of foster care and adoption:
"Authorized agencies play a major role in promoting
adoptions and in assisting the courts in administering that
important work. Their role should not be curtailed by
[*7]
precluding them from participation in the process under the
guise of expediency." (Matter of Mary, infra, at 47)
Similar deference to the separation of executive and judicial powers, the agency's
role, and the parameters of an Article 78 proceeding is due in the matter pending before this Court. That the appropriate permanency goal for Charisma now five years old and in foster care her entire life is adoption cannot seriously be questioned. Ms. P. requests that alternative goals be considered pursuant to FCA §1055-a(6), such as legal guardianship or "placement in another planned permanent living arrangement," such as her custody. However, the agency has not documented a "compelling reason for
determining that it would not be in the best interests of the child to be placed for adoption;" on the contrary, ACS, the agency and the law guardian support adoption, and Ms. P. implicitly agrees, when she argues that the Court may, pursuant to FCA § 255, order the agency to give its consent to her adoption of Charisma. Ms. P. states repeatedly in her papers that the Family Court must determine Charisma's best interests by "looking to the future," in contrast to the administrative proceedings which she argues are concerned only with the past. But as common sense dictates, and the Fourth Department cases make clear, administrative determinations that are not based on Charisma's best interests "would necessarily be arbitrary and capricious or unsupported by substantial evidence." Matter of Mary, infra at 47, citing Matter of O'Rourke, infra at 14. Ms. P. also argues that she seeks to participate in the Family Court permanency proceeding not to vindicate her own rights as a foster parent (which she concedes are properly pursued via administrative review and Article 78) but to protect Charisma's best interests, which are the focus of a section 1055-a hearing. That argument is specious. All foster parents challenging adverse rulings by agencies or courts claim to be acting not only on their own behalf but "in the best interests of the child."
For all these reasons, the Court now concludes that allowing Ms. P., a former foster parent, to participate in the 1055-a proceeding filed by ACS would be an abuse of
discretion. There remains only the question of her right to pursue her own separately filed 1055-a petition. Although sub-section (2)( c) permits a petition to be filed by "the foster parent in whose home the child resides or has resided," the Court does not believe that the legislature intended the Family Court to hear two separate petitions. If for some reason the agency fails to file a timely petition, the foster parent may do so. In this case,
however, ACS did file a petition. Further, the Court does not believe the statute contemplates a petition filed by a former foster parent from whom the child was removed for cause, a foster parent whose home was closed, and who has lost two administrative appeals.
Accordingly, the Court now grants the motion by ACS to re-argue its ruling of
October 25, 2004, and upon re-argument vacates that order, denies Ms. P.'s motion to participate in the permanency review, and dismisses her separate 1055-a petition.
In her March 2004 order Referee Lerner continued foster care until September 18, 2004. Based on the reports submitted between June 2004 and January 2005 (some attached to motions, [*8]others distributed to the parties in court) this Court has sufficient information to conclude that adoption remains the appropriate goal for Charisma and that the agency has made reasonable efforts to achieve it, by identifying a new adoptive home after Ms. P.'s foster home was closed. The clerk shall therefore enter an order continuing Charisma's foster care for six months, effective September 18, 2004. Future efforts to achieve permanency shall include completion of any further administrative challenges by Ms. P. and to assist the pre-adoptive foster parent to file a complete adoption petition.
The current foster care placement was due to expire on March 18, 2005. Based
on the pending motions, the Court finds good cause for ACS's failure to file a new petition, but directs that such be filed within ten days of receipt of this decision and order, with notice to the law guardian and current foster parent, returnable before this Court in Part 2 on May 26, 2005 (morning calendar).
This constitutes the decision of the court. Copies of this decision, with accompanying orders, shall be mailed to all counsel.
Dated: Brooklyn, New York
 May 31, 2005

___________________________________
 J. F. C.